**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN RADHAMES MALDONADO JIMENEZ, <br><br> Plaintiff, <br><br> - against - <br><br> TRANS UNION, LLC; and LVNV FUNDING LLC, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Juan Radhames Maldonado Jimenez ("Plaintiff" or "Mr. Maldonado Jimenez") brings this action on an individual basis, against Trans Union, LLC ("Defendant Trans Union" or "Trans Union") and LVNV Funding LLC ("Defendant LVNV" or "LVNV") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of the mixing Plaintiff's credit file with that of another consumer. Further Plaintiff brings an action against LVNV for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et. seq.*

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

1

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Trans Union acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.     Congress made the following findings when it enacted the FCRA in 1970:

(a)     The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.     Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.    Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or his credit and obtaining new credit.

12.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14. A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16. "Mixed files" create a false description and representation of a consumer's credit history.

17. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18. Mixed files are not a new phenomenon. Defendant Trans Union has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19. More recently, Defendant Trans Union has been the subject of numerous state attorney general actions relating to its mixed file problem.

20. For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

---

[1]    https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three  Last  visited  May  17,  2022;  *see  also*  https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf  Last  visited  May  17, 2022.

21.     Notwithstanding Defendant Trans Union's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant Trans Union sells information pertaining to one consumer in response to the application of the other.

23.     Defendant Trans Union has been sued thousands of times wherein an allegation was made that Defendant Trans Union violated the FCRA. Moreover, Defendant Trans Union is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant Trans Union mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant Trans Union continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the

FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant Trans Union continues to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant Trans Union continues to mix consumers' credit files with other consumers' credit files.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom*. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant Trans Union continues to mix consumers' credit files with other consumers' credit files.

29.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco*

*Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Trans Union, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of Defendant Trans Union's blatantly inaccurate credit reporting, wherein Defendant Trans Union published in a consumer report about Plaintiff the information of another consumer because Defendant Trans Union mixed Plaintiff's credit file with that of an unrelated consumer.

34.     Further, Plaintiff's claims also arise out of Defendant Trans Union's blatantly inaccurate credit reporting, wherein Defendant Trans Union permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to an unrelated consumer because Defendant Trans Union mixed Plaintiff's credit file with that of an unrelated consumer.

35.     Accordingly, Plaintiff brings claims against Defendant Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a

mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i; and for selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

36.     Further, Plaintiff also brings claims against the Furnisher, Defendant LVNV, for failing to conduct a reasonable investigation to determine whether the information Plaintiff disputed did in fact belong to another consumer and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681s-2b.

37.     Additionally, Plaintiff brings a claim against Defendant LVNV arising from violations of the FDCPA, 15 U.S.C. § 1692. The debt underlying this action qualifies as "debt" as defined under §1692a(5).

38.     Plaintiff contends that Defendant LVNV continued to attempt to collect on the debt through a lawsuit and attempts to enforce a judgment against Plaintiff even after LVNV knew that Plaintiff refused to pay the debt because the debt did not belong to him in violation of §1692e(2), §1692e(8), and §1692e(10) .

39.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., and violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq., as described herein.

## PARTIES

40.     Juan Radhames Maldonado Jimenez ("Plaintiff" or "Mr. Maldonado Jimenez") is a natural person residing in Yonkers, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

41.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Delaware, including within this District.

42.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

43.     The information Trans Union collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Trans Union also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

44.     Trans Union collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Trans Union collects and maintains information about them. Not only that, but consumers cannot remove information that Trans Union collects and maintains about them from the Trans Union database. Further, Trans Union sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Trans Union sold.

45.     Defendant LVNV Funding LLC ("Defendant LVNV" or "LVNV") is a limited liability company with a its principal place of business is located at 355 S Main Street, Suite 300-D, Greenville, South Carolina 29601 and is authorized to do business in the State of New York and in this District.

46.     LVNV is a "Furnisher" as defined in 12 CFR 1022.41. LVNV regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as LVNV, is an entity that reports information about consumers to consumer reporting agencies ("CRAs"), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. § 1681s-2b of the FCRA.

47.     LVNV is also a "debt collector" and has legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. § 1692 of the FDCPA.

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

49.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

50.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

51.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to

ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

52.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

53.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

54.     Similarly, the FCRA also imposes a duty upon the Furnishers, such as LVNV, to investigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. § 1681s-2b).

55.     The FCRA provides consumers with a private right of action against consumer reporting agencies, such as Trans Union, and data furnishers such as Tower, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANT TRANS UNION'S PROCESSING OF CREDIT INFORMATION

56.     Defendant Trans Union regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

12

57.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

58.     Defendant Trans Union collects information from thousands of furnishers.

59.     The process by which Defendant Trans Union receives, sorts, and stores information is largely electronic.

60.     Furnishers report credit information to Defendant Trans Union through the use of coded tapes that are transmitted to Defendant Trans Union on a monthly basis through software known as Metro 2.

61.     Defendant Trans Union takes credit information reported by furnishers and creates consumer credit files.

62.     Defendant Trans Union maintains credit files on more than 245 million consumers.

63.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## DEFENDANT TRANS UNION'S MIXED FILE PROBLEM

64.     Defendant Trans Union knows that different consumers have similar names.

65.     Defendant Trans Union knows that different consumers can have similar Social Security numbers.

66.     Defendant Trans Union knows that different consumers with similar names can also have similar Social Security numbers.

67.     Defendant Trans Union knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

68.     Defendant Trans Union matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

69.     Defendant Trans Union accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

70.     From time to time, Defendant Trans Union's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

71.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant Trans Union, regarding its significant failures and deficiencies with respect to mixed files.

72.     Despite Defendant Trans Union's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant Trans Union containing information belonging to another consumer.

73.     A mixed or merged credit file is the result of Defendant Trans Union's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

74.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant Trans Union to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

75.    The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant Trans Union.

76.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant Trans Union.

77.    Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

78.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

### A.    Plaintiff Becomes Aware of LVNV Lawsuit

79.    On or about May 2024, Plaintiff received a notice in the mail that he was being sued by LVNV in the Superior Court of New Jersey, in Camden.

80.    The notice had been mailed to Plaintiff's friend's home in New Jersey using an address that Plaintiff visits on occasion and that Plaintiff had on occasion used to receive delivery packages.

81.    In its lawsuit, LVNV purported that it was attempting to collect on a debt originally owed to Credit One Bank arising from credit card transactions occurring in the years 2020-2022 (the "LVNV Debt")

82.    Plaintiff was confused and alarmed by this as he has never had an account with Credit One and the notice of a lawsuit was the first time Plaintiff had heard from LVNV.

83.    Plaintiff's friend gave Plaintiff the notice and, after reviewing it, Plaintiff suspected that he was a victim of identity theft.

84.    Indeed, Plaintiff filed an Answer in the LVNV lawsuit in New Jersey explaining that it appeared that he was a victim of identity theft because the LVNV account and debt was not his.

85.    Accordingly, thereafter, Plaintiff requested from Trans Union a copy of his credit report from Trans Union to ensure that it was reporting only accurate and true information about him.

**B.    Plaintiff's Mixed Credit File as of May 8, 2024**

86.    On or about early May of 2024, Plaintiff viewed a copy of his credit file from Defendant Trans Union.

87.    Upon reviewing the contents of the Trans Union credit file, Plaintiff was confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

88.    Specifically, Defendant was reporting and maintaining in Plaintiff's credit file the following accounts which did not belong to Plaintiff (collectively, the "Disputed Accounts"):

        (a)    LVNV Funding LLC (related to the LVNV Debt)
               Account Number: 444796227235XXXX
               Date Opened (available for collections): June 16, 2022
               Original Creditor: Credit One Bank N A

        (b)    Pentagon FCU
               Account Number: 430679211090XXXX
               Date Opened: June 21, 2018

        (c)    Security Credit Services
               Account Number: 44994XX
               Date Opened (available for collections): May 27, 2022

        (d)    Dept Of Ed / Nelnet #90000071639****
               Date Opened: 10/22/2014
               Balance: $3,246

(e)     Dept Of Ed / Nelnet #90000071639****
        Date Opened: 10/22/2014
        Balance: $4,408

(f)     US. Dept of Education/GL #268915669779****
        Date Opened: 10/22/2014
        Date closed: 02/28/2023
        Balance: $0

89.     Further, Defendant was reporting and maintaining in Plaintiff's credit file the

following addresses which did not belong to Plaintiff:

(a)     2229 Park Way, Bakersfield, CA 93304-1116

(b)     3022 Berger St, Bakersfield, CA 93305-2008

(c)     3 BN HQ T APT 400, Parris Island, SC 29905

(d)     BLT DET HS APT 7306, FPO, AE 09502

(e)     613 Swan St, Dunkirk, NY 14048-2423

(f)     197 E 2ND ST APT 1, Dunkirk, NY 14048-1873

(g)     606 Main St, Dunkirk, NY 14048-2627

(h)     408 Water St, Bakersfield, CA 93305-2534

(i)     3 BN HQ Apt 400, Parris Island, SC 29905

(j)     3 BN HQ BLDG 400, Parris Island, SC 29905

(k)     211 Oakland Ave Apt 18, Audubon, NJ 08106-1548

(l)     3828 Shenandoah Dr, Bakersfield, CA 93304-6746

(m)     111 E 6th St Apt 2, Jamestown, NY 14701-5341

(n)     123 S Zebra St, Dunkirk, NY 14048-1837

(o)     PO BOX 182525, Beaufort, SC 29905

90.     By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

91.     Further, Defendant was also reporting and maintaining in Plaintiff's credit file the following phone numbers, which did not belong to Plaintiff:

(a)     661-407-3528

(b)     661-529-5827

(c)     661-864-7149

(d)     661-374-9010

(e)     716-960-0815

(f)     716-413-9159

(g)     716-366-8080

(h)     716-720-5654

(i)     716-483-1977

(j)     843-476-1411

(k)     716-410-1077

(l)     313-740-3509

(m)     843-441-0390

92.     Further, Defendant was also reporting and maintaining in Plaintiff's credit file the following name, which did not belong to Plaintiff:

(a)     Juan **P.** Maldonado

93.    Further, Defendant was also reporting and maintaining in Plaintiff's credit file the following Social Security number, which did not belong to Plaintiff:

(a)    XXX-XX-9978

94.    Further, Defendant was also reporting and maintaining in Plaintiff's credit file the following employment information, which did not belong to Plaintiff:

(a)    Kelly Services December 25, 2009 Laborer

95.    Finally, Defendant was also reporting and maintaining in Plaintiff's credit file a hard inquiry relating to a Toyota auto loan application dated in December 2022, which did not belong to Plaintiff.

96.    Upon information and belief, a different consumer had submitted an application for an auto loan to a Toyota-related entity in or about December 2022, which reflected as a hard inquiry in Plaintiff's credit file dated in or about December 2022.

97.    Put simply, Trans Union has provided to that Toyota-related entity Plaintiff's credit report and credit information without a permissible purpose and without Plaintiff's authorization.

**C.    Plaintiff's May 2024 Dispute to Defendant**

98.    On or about May 2024, worried that something was very wrong with his credit file, Plaintiff called Defendant Trans Union and disputed the inaccuracies as not belonging to him.

**D.    Defendant Trans Union's Unreasonable Dispute Reinvestigation**

99.    On or about June 5, 2024, Defendant Trans Union issued dispute results to Plaintiff wherein it failed to completely and permanently unmix Plaintiff's credit file and/or remove all the disputed and inaccurate credit information.

100.    In particular, Trans Union's dispute results notice to Plaintiff explained that it had removed one account, the PENTAGON FCU #430679211090**** account, but that it would not

remove two other accounts, namely, LVNV FUNDING LLC #444796227235****, SECURITY CREDIT SERVICES # 44994"*.

101.    Upon information and belief, the PENTAGON FCU #430679211090**** account & the SECURITY CREDIT SERVICES # 44994"* account, are associated with the same underlying debt.

102.    Crucially, Defendant Trans Union failed to remove the false Social Security number, the other Disputed Accounts, nor the many other items of personal identifying information that were "mixed" and did not belong to Plaintiff.

103.    Defendant Trans Union failed to reasonably reinvestigate Plaintiff's May 2024 dispute and failed to unmix Plaintiff's credit file not permanently remove the disputed information.

104.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

105.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation of Plaintiff's May 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information and failed to unmix Plaintiff's credit file not permanently remove the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**E.    The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

106.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

107.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries'

standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

108.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

109.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

110.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

111.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

112.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

113.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

114.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

115.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit

account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

116.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**F.    Defendant LVNV's Unreasonable Dispute Investigation March 2024**

117.    Upon information and belief, Defendant LVNV verified the disputed LVNV Debt account and information as accurate in response to Defendant Trans Union's ACDV dated in or about May 2024.

118.    In so doing, Defendant LVNV violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed information did not belong to Plaintiff.

**G.    Plaintiff Responds to LVNV's Lawsuit**

119.    On or about June 6, 2024, Plaintiff traveled to the Superior Court of New Jersey, in Camden, in relation to LVNV's lawsuit to collect a purported debt, and informed that court that he was not the owner of the Credit One Bank account or debt at issue in that case. He was also presented by LVNV's attorneys with a set of documents associated with the alleged debt, one of which contained the last digits of a Social Security number.

120.    Plaintiff did not have any Social Security number ("SSN") in 2022 or even 2023. Plaintiff had only an Individual Taxpayer Identification Number ("ITIN").

121.     The last digits of a Social Security number associated with the debt that LVNV was attempting to collect upon was different from the digits in Plaintiff's ITIN.

122.     Plaintiff does not have any SSN that matches with the SSN digits associated with the LVNV Debt.

123.     It is not possible that Plaintiff owed the LVNV Debt, which was associated with an SSN that was not Plaintiff's.

124.     Per the court's instruction, on June 6, 2024, Plaintiff filed a pro se Answer to advise that Court and LVNV that the lawsuit must have been filed against him in error, because he does not even have an SSN (only an ITIN), and that the LVNV Debt could not be his and was not his.

125.     On July 9, 2024, LVNV filed a motion for summary judgment against Plaintiff. Attached to the motion for summary judgment were several exhibits, including statements for the Credit One account that had been mailed to a consumer named "Juan Maldonado" at 3823 Shenandoah Drive Bakersfield, California.

126.     Plaintiff has never lived in California

127.     Plaintiff has never visited California.

128.     Plaintiff has no family in California.

129.     From another exhibit (Exhibit C), an affidavit by LVNV's authorized representative, Plaintiff learned that the credit account underlying the LVNV Debt was opened on February 8, 2015, which was years before Plaintiff moved to the United States in December 2018.

130.     Despite Plaintiff's protestations and the evidence supporting that he had no relation to the LVNV Debt, LVNV nevertheless proceeded in its actions to force Plaintiff to pay the :VNV Debt, and it successfully obtained summary judgment in its favor and against Plaintiff in July 2024.

**H.      Defendant LVNV's Violation of FDCPA**

131.    Defendant LVNV was and is attempting to collect a debt from Plaintiff.

132.    LVNV has actual and/or constructive notice that Plaintiff disputed the LVNV Debt that LVNV was attempting to collect, when Plaintiff disputed the account by contesting the legal action brought by LVNV.

133.    Defendant LVNV violated the FDCPA by trying to collect on a debt by falsely representing the character, amount, or legal status of the debt that had been disputed by Plaintiff as not belonging to him, in violation of §1692e(2).

134.    Defendant LVNV, as a debt collector, is well aware of the FDCPA.

135.    Defendant LVNV's violation of the FDCPA did not result from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

136.    As a result of Defendant LVNV's unlawful conduct, Plaintiff has been harmed.

137.    As a result of Defendant LVNV's unlawful conduct, LVNV had a judgment entered against Plaintiff based on someone else's debt and identifying information.

138.    Each and every attempt from LVNV to collect the LVNV Debt caused Plaintiff distress, anxiety, and frustration.

139.    Each and every attempt from LVNV to collect the LVNV Debt caused Plaintiff to come to the devastating realization that no matter what Plaintiff did, Plaintiff will continue to suffer the consequences of being a victim of a mixed consumer file.

140.    Plaintiff was forced to travel to New Jersey to respond to a baseless legal action brought by LVNV to collect on a debt that Plaintiff did not owe.

## PLAINTIFF'S DAMAGES

141.    Upon information and belief, because Defendant Trans Union continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant Trans Union continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

142.    As a result of the "mixed file," Defendant Trans Union made it practically impossible for Plaintiff to obtain credit.

143.    Due to Defendants' ardent refusals to comply with their respective obligations pursuant to the FCRA, Plaintiff's own credit applications were frustrated.

144.    Indeed, Plaintiff had submitted a credit application to Capital One for a credit card during the past two years, which application was denied.

145.    Plaintiff's application to Capital One was denied in substantial part as a result of Trans Union's erroneous and violative inclusion of the Disputed Accounts and inaccurate and "mixed" information in Plaintiff's credit file and consumer report to Capital One.

146.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

147.    At all times pertinent hereto, Defendants' conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

148.    As a standard practice, Defendant Trans Union does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a)

must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

149.    Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' violations of the FCRA are willful.

150.    As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

151.    As a result of LVNV's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from

his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and of being forced to expend time and labor and money defending himself in court against LVNV's spurious claims that he was a credit delinquent for which LVNV may and will compel Plaintiff to hand-over his hard-earned money to LVNV.

**CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendant Trans Union)**

152.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

153.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

154.    On at least one occasion, Defendant Trans Union prepared patently false consumer reports concerning Plaintiff.

155.    Defendant Trans Union mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

27

156.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

157.   As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information mixed into Plaintiff's credit file.

158.   Defendant Trans Union's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

159.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendant Trans Union)

160.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

161.    The FCRA mandates that Defendant Trans Union conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

162.    The FCRA provides that if Defendant Trans Union conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

163.    Plaintiff initiated a dispute with Defendant Trans Union and disputed inaccurate information reporting in his credit file and requested that Defendant Trans Union correct and/or delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

164.    Defendant Trans Union conducted virtually no investigation of Plaintiff's dispute, or such investigation was so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

165.    Plaintiff expended resources in the form of time, money, and effort to dispute the inaccurate information with Defendant Trans Union, to no avail.

166.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

167.    As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information mixed into Plaintiff's credit file.

168.    Defendant Trans Union's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

169.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

<u>COUNT III</u>
**15 U.S.C. § 1681b(a)**
**Furnishing a Credit Report Without a Permissible Purpose**
**(Third Claim for Relief Against Defendant Trans Union)**

170.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

171.    This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

172.    Plaintiff is a "consumer" as defined by the FCRA.

173.    Defendant Trans Union is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

174.    The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

175.    On at least one occasion but likely on more occasions, Defendant Trans Union furnished Plaintiff's credit report to third-party entities without a permissible purpose and without Plaintiff's authorization or consent, in response to credit applications of another consumer, which did not involve Plaintiff, and which Defendant Trans Union therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

176.    Defendant Trans Union violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

177.    As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private

31

financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information mixed into Plaintiff's credit file.

178.    Defendant Trans Union's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

179.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
### 15 U.S.C. § 1681s-2b
**Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer (First Claim for Relief Against Defendant LVNV)**

180.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

181.    Defendant LVNV refused to remove information that belonged to another consumer and which did not belong to Plaintiff.

182.    Defendant LVNV violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s),

including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Defendant Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Defendant Trans Union.

183.    As a result of Defendant LVNV's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information mixed into Plaintiff's credit file.

184.    Defendant LVNV's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant LVNV was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

185.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant LVNV in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT V
### Violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692
### (Second Claim for Relief against Defendant LVNV)

186.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

187.    Defendant LVNV violated the FDCPA by using false, deceptive and misleading communications when attempting to collect debts from Plaintiff when LVNV had knowledge that those debts were not Plaintiff's, in violation of §1692e. Specifically:

(a)    Defendant LVNV falsely represented the character, amount, or legal status of the debts that had been disputed by Plaintiff as not belonging to him, in violation of §1692e(2)

(b)    Defendant LVNV's collection attempts and communications to Plaintiff and to the court in Camden, New Jersey in furtherance of such collection attempts contained credit information which it knew or should have known were false, in violation of §1692e(8).

(c)    Defendant LVNV's collection attempts further contained false representations and were a deceptive means to attempt to collect a debt or to obtain information concerning Plaintiff, in violation of §1692e(10).

188.    As a result of LVNV's unlawful conduct, Plaintiff has been harmed. Each and every attempt to collect from LVNV, concerning the debt that Plaintiff had abundantly disputed, forced Plaintiff to relive and compound the pain, stress, and suffering from the consequences of being a victim of having his consumer file mixed with another.

189.    Each and every attempt to collect from LVNV caused Plaintiff distress, shock and frustration.

190.    Each and every attempt to collect from Defendant LVNV caused Plaintiff to come to the devastating realization that no matter what Plaintiff did, Plaintiff will continue to suffer the consequences of being a victim of a mixed consumer file.

191.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of having his consumer file mixed with an unrelated consumer and whose veracity is doubted and questioned and disbelieved by Defendant LVNV.

192.    Additionally, Plaintiff has had to spend time and effort to contest the legal action LVNV brought against Plaintiff to collect on the debt Plaintiff did not owe.

193.    Defendant LVNV's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1692k(a).

194.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant LVNV in an amount to be determined by the Court pursuant to §1692k(a)(3).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a)    Determining that Defendants negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA;

d)    Determining that Defendant LVNV violated the FDCPA;

e)    Awarding Plaintiff actual, statutory, and punitive damages as against Defendant LVNV as provided by the FDCPA;

f)    Awarding Plaintiff reasonable attorneys' fees and costs as against Defendant LVNV as provided by the FDCPA; and

g) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: August 27, 2024,                    **CONSUMER ATTORNEYS**

By:    */s/ Levi Y. Eidelman*
Levi Y. Eidelman
300 Cadman Plaza West, 12th Floor
Brooklyn, NY 11201
T: (718) 360-0763
F: (718) 715-1750
E: leidelman@consumerattorneys.com

*Attorneys for Plaintiff*
*Juan Radhames Maldonado Jimenez*